**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| JOVANY BRITO,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>    Defendant. | CASE NO. 1:21-CV-01182<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**<u>MEMORANDUM OPINION AND ORDER</u>** |

Plaintiff Jovany Brito ("Plaintiff" or "Mr. Brito") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned pursuant to the consent of the parties. (ECF Doc. 19.)   For the reasons explained herein, the Court **VACATES and REMANDS** the Commissioner's decision.  On remand, the ALJ should consider the complete evidentiary record and articulate a clear and accurate explanation for his findings as to the weight of the opinion evidence, and should specifically account for the findings of the three examining medical sources with respect to the fourth category of mental functioning.

1

## I.      Procedural History

On September 30, 2015, Mr. Brito protectively filed an SSI application.  (Tr. 15.)  He

alleged a disability onset date of September 30, 2015.  (Tr. 15, 163, 178.)  He alleged that he was

disabled due to Asperger's Syndrome.  (Tr. 101, 119.)  His application was denied at the initial

level (Tr. 101-03) and upon reconsideration (Tr. 119-20).  He requested a hearing (Tr. 123-25),

which was held before an Administrative Law Judge ("ALJ") on October 25, 2017 (Tr. 31-71).

On December 11, 2017, the ALJ issued an unfavorable decision, finding Mr. Brito had

not been under a disability since September 30, 2015, the date the application was filed.  (Tr. 12-

30, 588-606.)  On May 19, 2018, the Appeals Council denied Mr. Brito's request for review of

the ALJ decision, making it the final decision of the Commissioner.  (Tr. 1-6, 160-62, 607-12.)

Mr. Brito filed an appeal with the United States District Court, and the district court

remanded the matter to the Commissioner for further administrative proceedings pursuant to the

parties' joint stipulation for remand on January 31, 2019.  (Tr. 613-15.)  On March 18, 2019, the

Appeals Council remanded the case to the ALJ.  (Tr. 616-20.)  The Appeals Council explained

that the decision did "not contain an adequate evaluation of the opinion evidence," in particular,

the opinion of consultative examiner Dr. Wax.  (Tr. 618.)

The ALJ conducted a new hearing on August 26, 2019 (Tr. 497-542), and issued an

unfavorable decision on September 10, 2019, finding Mr. Brito had not been under a disability

since September 30, 2015, the date the application was filed (Tr. 456-96).  Mr. Brito filed

exceptions to the ALJ's decision with the Appeals Council on October 8, 2019.  (Tr. 675-91.)

On May 4, 2021, the Appeals Council found no reason to assume jurisdiction, making the ALJ's

September 10, 2019 decision the final decision of the Commissioner.  (Tr. 449-55.)  Mr. Brito

then filed the pending appeal with this Court.  (ECF Doc. 1.)

## II. Evidence

Although Mr. Brito has severe physical and mental impairments that were identified by the ALJ (Tr. 462), he only challenges the ALJ's decision relative to his alleged mental health impairments (ECF Doc. 41-1, pp. 1, 14-24). The evidence summarized herein is accordingly focused on evidence pertaining to those impairments.

### A. Personal, Educational, and Vocational Evidence

Mr. Brito was born in 1994. (Tr. 163, 489.) He graduated from high school, having attended special education classes, and has no past relevant work. (Tr. 41, 183, 282, 489, 513.)

### B. Medical Evidence

#### 1. Treatment History

Mr. Brito received mental health treatment at MetroHealth Medical Center ("Metro"). He received treatment from child and adolescent psychiatrist Kamal-Neil Dass, D.O. in July 2014, prior to his alleged onset date, for mental health impairments that included anxiety and ADHD. (Tr. 237-38.) He reported interest in attending college one day and finding a job by September. (Tr. 238.) Mental status examination findings were normal. (*Id*.) Dr. Dass continued him on Vyvanse. (*Id*.) Mr. Brito returned to Dr. Dass in December 2014, and reported he was still looking for a job and living at home. (Tr. 233.) His mental status examination findings were normal. (Tr. 233-34.) He was diagnosed with: autistic spectrum disorder; ADHD, combined type; and anxiety disorder, NOS. (Tr. 234.) Dr. Dass continued Mr. Brito's medication, but informed Mr. Brito that he was leaving the practice and that Mr. Brito should follow with his primary care physician for medication management. (*Id*.)

Mr. Brito saw his primary care physician Lisa Torres, M.D. on July 27, 2015 for follow up regarding ADHD and obesity. (Tr. 244.) He reported he had been working out daily for at

least thirty or forty minutes, and that he had energy and was sleeping better.  (*Id*.)  He also

reported being excited because he thought he might be hired at a video game store.  (*Id*.)  He

continued to live at home and performed household chores.  (*Id*.)  He was pleasant, talkative, and

cooperative during the examination.  (Tr. 226.)  He was diagnosed with ADHD, combined type.

(Tr. 227.)  Dr. Torres continued him on Vyvanse for his ADHD, which she described as

controlled.  (*Id*.)

　　　　Mr. Brito returned to Metro on January 25, 2016, where he saw Vikram Vaka, M.D. for

pharmacologic management.  (Tr. 325.)  He reported that medication helped him "stay calm,

focus, and feel[] better about himself."  (*Id*.)  He also told Dr. Vaka he was unable to work

because he felt very anxious when he tried to go outside, feeling overwhelmed and panicky.

(*Id.*)  He also reported feeling angry and guilty because he could not help with finances.  (*Id*.)

He denied hallucinations, suicidal ideations, and homicidal ideations.  (*Id*.)  Mental status

examination showed him to be well groomed and with good hygiene.  (Tr. 327.)  He was

cooperative but withdrawn.  (*Id*.)  His speech was spontaneous with a normal rate and flow.  (*Id*.)

His thought process was logical and organized.  (*Id*.)  There was no evidence of paranoia,

delusions, or perceptual disturbance.  (*Id*.)  His mood was dysphoric and anxious and he had a

constricted affect.  (*Id*.)  His attention and concentration were impaired.  (*Id*.)  His memory was

within normal limits and his judgment and insight were fair.  (*Id*.)  He was diagnosed with

ADHD and Autism Spectrum Disorder, with symptoms of anxiety subsumed.  (*Id*.)  Dr. Vaka

continued him on Vyvanse and started him on Lexapro for anxiety.  (Tr. 328.)  Dr. Vaka also

referred him to therapy for anxiety in social situations.  (*Id*.)

　　　　Mr. Brito returned to Dr. Vaka on March 21, 2016, reporting that his concentration and

focus were "much improved" on Vyvanse and his mood was better.  (Tr. 318.)  He reported that

he was able to leave his house and stay out longer, but continued to report anxiety about leaving his house and being fearful in unfamiliar situations.  (*Id*.)  He reported that his sleep was generally okay, but that it was difficult for him to fall asleep some nights due to racing thoughts. (*Id*.)  He denied hallucinations, suicidal ideations, and homicidal ideations.  (*Id*.)  He was well groomed with good hygiene, but slightly overweight.  (Tr. 319.)  He was cooperative and calm, his speech was spontaneous with normal rate and flow, his thought process was logical and organized, his affect was full but he was "somewhat anxious at times," there was no evidence of paranoia, delusions, or perceptual disturbance, his attention and concentration were improved, his memory was within normal limits, and his insight and judgment were fair.  (*Id*.)  Dr. Vaka indicated his symptoms were in partial remission, increased Lexapro for anxiety, and started him on Trazadone for sleep and anxiety.  (Tr. 319-20.)

Mr. Brito returned to Metro on December 13, 2016 for mental health treatment.  (Tr. 340-50.)  He saw Margaret Roll, LISW-S for counseling (Tr. 340-43) and Sharon Roesner, CNP for pharmacologic management (Tr. 347-50). He reported that too much interaction wore him out, and that group settings were too threatening for him.  (Tr. 340.)  He also reported that he avoided other people and had been lashing out at those who were close to him.  (Tr. 341.)  However, he was also "practicing" talking to his friends by calling and texting them more often.  (Tr. 340.) He reported meeting a friend online and was trying to learn French.  (*Id*.)  He felt "like a parasite" because he was unable to contribute more to his family financially, stating that "chores don't pay the bill."  (Tr. 341.)  He did not think he could work or do anything outside because his brother was outside when he was murdered.  (*Id*.)  He also reported a history of auditory and visual hallucinations that at times commanded him to do things like fight with others while in school.  (Tr. 348.)  He also heard voices earlier that day.  (Tr. 340.)

At a December 13, 2016 counseling session, Mr. Brito was adequately groomed, but also anxious, tense, and irritable with a constricted affect. (Tr. 342-43.) He reported that it was hard for him to express his emotions. (Tr. 343.) At a medication management appointment on the same date, CNP Roesner noted Mr. Brito was well-groomed, but also depressed, restless, agitated, guarded, and anxious with a flat affect. (Tr. 348-49.) LISW Roll observed that Mr. Brito's speech was clear but low. (Tr. 342.) CNP Roesner observed that his speech was pressured and slowed. (Tr. 348.) LISW Roll noted Mr. Brito reported he heard whispers and someone calling his name without commands. (Tr. 342.) CNP Roesner also noted reports of auditory and visual hallucinations with commands at times. (Tr. 348.) She additionally noted that Mr. Brito reported paranoid thoughts, difficulty being around others, and difficulty being out of the house. (*Id*.) LISW Roll and CNP Roesner both found Mr. Brito's thought process was logical and organized, his judgment and insight were fair, his memory was within normal limits, and his attention and concentration were sustained. (Tr. 342, 348-49.) CNP Roesner diagnosed Mr. Brito with unspecified schizophrenia spectrum and other psychotic disorder, unspecified ADHD, and panic disorder. (Tr. 349.) She recommended adding Risperidone to Mr. Brito's medications to address his hallucinations, but he was "cautious" about starting a new medication because it would cost his parents money. (Tr. 349.) CNP Roesner explained that the copay would not be a lot and he agreed to discuss starting the new medication with his parents. (*Id*.)

Mr. Brito returned to LISW Roll for counseling on January 3, 2017. (Tr. 354.) LISW Roll observed, and Mr. Brito acknowledged, that he was in better control that day. (*Id*.) He reported difficulty with processing things and hearing the truth. (*Id*.) He also reported having a hard time remembering even simple things. (*Id*.) On examination, LISW Roll observed him to

be anxious and tense but generally calmer. (Tr. 355.) Otherwise, his examination findings were similar to those observed in December 2016. (*Compare* Tr. 355 *with* Tr. 342-43.)

Mr. Brito returned to CNP Roesner for medication management on January 17, 2017 and January 31, 2017. (Tr. 361, 365.) He reported headaches and chest pain. (Tr. 361.) During the January 17, 2017 appointment, he grabbed at his chest periodically while speaking and his speech was pressured. (*Id*.) He reported he was not able to talk socially with his peers and felt awkward when forced to talk to people. (*Id*.) He reported isolating himself because he felt different from other people. (*Id*.) On January 31, 2017, CNP Roesner noted that Mr. Brito did "not seem to want to get better because he [did] not want to work, because of his anxiety and panic." (Tr. 367.) CNP Roesner's mental status examination findings at the January 2017 appointments were similar to those from December 2016, although CNP Roesner added that Mr. Brito's anxiety was high and he felt he had no emotions. (*Compare* Tr. 361, 366 *with* Tr. 348-49.) Mr. Brito's diagnoses and medications were not changed. (Tr. 367.)

Mr. Brito saw LISW Roll for counseling sessions on February 7, 2017 and March 13, 2017. (Tr. 371-73, 377-79.) In February, he was proud of himself for being on time for his appointment. (Tr. 371.) He reported having nightmares. (*Id*.) He also reported he wanted to work and leave the house to see friends, but had a hard time being away from home for long periods of time because it felt "alien to him" and was "extremely difficult" for him. (*Id*.) He reported interest in going to the movies with friends and had been planning it for months. (*Id*.) They discussed graded exposure and Mr. Brito stated he would try to call a friend and make plans to go to the movies. (Tr. 372.) In March, he related that he went to a friend's house for about an hour but was uncomfortable and did not have fun. (Tr. 378.) When he was discussing this experience, LISW Roll observed him clutching his fists. (*Id*.) He reported feeling angry that

7

he could not feel comfortable, and was jealous of his friend for not having the same problem. (*Id*.)  He reported that he saw his dad in jail a week earlier.  (*Id*.)  He explained that he had not seen his dad for years and felt bad because he had to fake his emotions.  (*Id*.)  He reported hearing voices but did not know what they were saying.  (*Id*.)  Mr. Brito's mental examination revealed a tense, frustrated, and blocked mood.  (Tr. 379.)  He was also observed to be anxious with a congruent affect but was gradually calmer.  (*Id*.)

Mr. Brito returned to CNP Roesner on April 11, 2017.  (Tr. 383.)  He discussed his visit with a school friend, reporting that he did "pretty well" but he was thinking the entire time that he wished he could go to school, have friends, and easily talk to people.  (*Id*.)  He did not think he could get away from his anxiety, and was observed to hold his chest and start to breathe shallow when talking about getting better.  (*Id*.)  He explained that he visited with his dad but had a hard time starting a conversation with him, and was focused on how uncomfortable he was. (*Id*.)  His mental status examination showed him to be restless, agitated, guarded, anxious, and depressed with a flat affect.  (*Id*.)  His speech was pressured and slowed.  (*Id*.)  His thought process was logical and organized, his attention and concentration were sustained, his memory was within normal limits, and his judgment and insight were fair.  (*Id*.)  There were no changes to Mr. Brito's diagnoses or medication.  (Tr. 384.)

Mr. Brito returned to LISW Roll for counseling on May 9, 2017, reporting that he was trying to interact with friends and had gone to a movie with some friends and invited them to his house.  (Tr. 387.)  He said it was really hard but he was trying.  (*Id*.)  He appeared very tense, and ruminated over unpleasant events from his past.  (*Id*.)  He was cooperative during the appointment but clutched his hands and presented with labored breathing which he associated with anxiety and tension.  (Tr. 388.)  LISW Roll described his mood as anxious and depressed

with a constricted affect.  (*Id*.)  His attention span and concentration were described as distractible, his memory was grossly intact, and his judgment and insight were fair.  (*Id*.)  His thought process was logical and organized, although he reported racing thoughts.  (*Id*.)  Mr. Brito returned to LISW Roll on May 23, 2017.  (Tr. 392.)  He reported aggravation with his mother over a recent disagreement, but also that he decided he would practice calling friends.  (*Id*.)  His mental status examination findings were similar to those from his prior appointment.  (*Compare* Tr. 393 *with* Tr. 388.)  LISW Roll observed that he remained depressed and anxious but was making some progress in that he was challenging himself to engage with his peers and call Vocational Services with provider support.  (Tr. 393.)

Mr. Brito returned to LISW Roll on June 19, 2017, reporting anxiety over his attempted phone communication with Vocational Services.  (Tr. 397.)  He reported going out to the movies with his mother, but got a horrible headache that caused him to have to leave the theater.  (*Id*.)  He was still able to see the movie from the lobby.  (*Id*.)  He reported going overboard by sending videos to a friend, and that his friend "blocked" him.  (*Id*.)  They discussed learning from the experience and understanding "pacing, 'instead of getting carried away.'"  (*Id*.)

Mr. Brito met with Jacqueline Stanton, Ph.D., CRC, PCC-S, a vocational counselor at Metro on July 3, 2017 to "further explore SSI appeals process as he [felt] his developmental disabilities and mental health conditions [were] too severe to consider vocational planning at [the] time."  (Tr. 402.)  Mr. Brito reported severe anxiety regarding their meeting and a racing heart.  (*Id*.)  Ms. Stanton observed that he had difficulty making eye contact and was sweating profusely.  (*Id*.)  Mr. Brito said he left his house only for medical appointments, did not drive or use public transportation, and felt like a financial burden to his family.  (*Id*.)  He enjoyed video games and caring for his pets, which included five turtles, one tarantula, and one scorpion.  (*Id*.)

9

He reported having friends from school come to his house, but said he could not visit them at their homes or go out with them.  (*Id*.)  He reported being anxious.  (*Id*.)  A vocational assessment was planned.  (Tr. 406.)

Mr. Brito returned to CNP Roesner for medication management on July 18, 2017.  (Tr. 406.)  He reported spending his time and energy trying to get rid of yellow jackets that were under his porch, including making a flame thrower to try to burn them and using firecrackers. (*Id*.)  On examination, his thought process was logical and organized, his thought content was appropriate, his attention and concentration were sustained, his memory was within normal limits, and his judgment and insight were fair.  (Tr. 406.)  He was well-groomed, but restless, anxious, and depressed, with pressured and slowed speech and a flat affect.  (*Id*.)  He reported hearing his own voice.  (*Id*.)  He also reported concern over being a burden to his mother, and did not want more medication because of the cost to his mother.  (*Id*.)  His diagnoses were unchanged.  (Tr. 406-07.)  CNP Roesner decreased Plaintiff's Vyvanse dose and noted that he was "very cautious about adding medications."  (Tr. 407.)  Mr. Brito also saw LISW Roll for counseling in July 2017.  (Tr. 419-21.)  His mental status examination findings were similar to those noted during his May sessions with LISW Roll.  (*Compare* Tr. 420 *with* Tr. 388, 393.)

Mr. Brito underwent a vocational evaluation with Dianne Zrenner M.Ed., LPC, CRC on August 7 and August 8, 2017.  (Tr. 412-15, 429-34.)  Ms. Zrenner then prepared an Individualized Vocational Evaluation Test Summary on August 17, 2017.  (*Id*.)  The summary reports that Mr. Brito appeared nervous about the testing, but was able to complete the tasks with the exception of the arithmetic; he stopped arithmetic testing after being informed that he could not use a calculator.  (Tr. 415, 433.)  He reported that he was not interested in school and was not sure he could work, but expressed interest in games shops and pet stores.  (Tr. 412, 415, 430,

433.)  The testing showed Mr. Brito to have the following vocational strengths: above average reading and sentence comprehension; met competitive standards for accuracy for numerical sorting and independent problem-solving work samples.  (Tr. 415, 434.)  His testing also showed him to have the following vocational barriers: below average arithmetic skills, learning potential, and finger and manual dexterity; very low interests; did not meet competitive standards for speed on Valpar work samples; and no work experience.  (*Id*.)  Ms. Zrenner concluded that "Mr. Brito's vocational potential [was] guarded and no occupations [could] be recommended at [the] time."  (*Id*.)  She recommended that "he get involved in agency supports for work adjustment programs, travel training, and on the job supports."  (*Id*.)  She also noted he might be eligible for services through the Cuyahoga County Board of Developmental Disabilities and/or Opportunities for Ohioans with Disabilities.  (*Id*.)

Mr. Brito returned to LISW Roll for counseling on August 14, 2017.  (Tr. 437.)  He reported that the vocational testing was "really difficult."  (Tr. 437.)  He also reported getting headaches frequently and that he was still nervous and anxious.  (*Id*.)  He saw CNP Roesner for medication management on August 15, 2017, reporting that he was able to get through six hours of vocational testing but developed a headache on both days of testing.  (Tr. 441-42.)  CNP Roesner observed that Mr. Brito was well-groomed with logical and organized thought processes, appropriate thought content, sustained attention and concentration, normal memory, and fair judgment and insight.  (*Id*.)  She also observed that he was restless, anxious, and depressed, with a flat affect, and his speech was pressured and slowed.  (*Id*.)  He reported hearing his own voice.  (*Id*.)  Mr. Brito's diagnoses were not changed, and his medications were continued.  (Tr. 442-43.)

Mr. Brito saw LISW Roll for counseling at the end of August 2017 (Tr. 758-60) and again in September 2017 (Tr. 767-68.)  At his September appointment, he reported having "good news."  (Tr. 767.)  He was spending time with his neighbor, who was a beekeeper, and attended a "bee seminar" that lasted two hours with a friend.  (*Id*.)  He also had dinner at a busy restaurant with his friend, saying he "endured it."  (*Id*.)  He noted that was "getting out more, making telephone calls, [and] taking more initiative."  (*Id*.)  However, he was also having problems with a friend who did not want to have contact with him because he had sent the friend 100 texts in one day.  (*Id*.)

Although Mr. Brito expressed some optimism in September (Tr. 768), he reported that he was "not that well" when he returned to see LISW Roll on October 2, 2017 (Tr. 772).  He was not sleeping well and was having anticipatory anxiety due to a disability hearing scheduled for the following month.  (Tr. 772.)  He was able to leave his house to go to the movies and grocery shopping with his mom.  (*Id*.)  He had "decided to leave the yellow jackets alone," explaining that he knew who could not use the flame thrower because it could burn the fence.  (*Id*.)  His mental status examination showed him to be anxious with a congruent affect and racing thoughts, blocked by anxiety.  (Tr. 773.)  He did not report hallucinations but did report difficulty with attention and concentration.  (*Id*.)  LISW Roll noted that his judgment and insight were questionable.  (*Id*.)  She also noted that Mr. Brito was "challenging himself to practice exposure."  (*Id*.)  At his October 10, 2017 appointment, he continued to report "high degrees of anxiety that interfere[d] in his ability to function outside of the home."  (Tr. 777.)

Mr. Brito presented to Emmanuel Boakye, M.D. on October 16, 2017 in the Pediatric Comprehensive Care department for completion of a medical source statement relating to his physical capacity. (Tr. 446-47, 782-83.)   Dr. Boakye noted that it was difficult for him to obtain

Mr. Brito's medical history because Mr. Brito was a poor historian, worsened by the fact that Mr. Brito was more anxious because he was at the appointment alone.  (Tr. 782.)  Dr. Boakye also observed that Mr. Brito was more anxious with detailed questioning.  (*Id*.)

Mr. Brito attended counseling with LISW Roll on October 24, 2017, reporting that he "challenge[d] himself to go out twice over the weekend" and "[m]anaged to speak to others." (Tr. 788.)  He returned to counseling on November 7, 2017, reporting that he had his SSI hearing and it was "very anxiety provoking."  (Tr. 793.)  He also reported that he was trying to "challenge his anxiety" and "learn from experiences."  (*Id*.)  Mental examination findings continued to show Mr. Brito to be anxious.  (Tr. 794.)  His judgment and insight were questionable and he reported difficulty with attention and concentration.  (*Id*.)  His speech was clear and his memory was within normal limits.  (*Id*.)

Mr. Brito returned to CNP Roesner on November 20, 2017.  (Tr. 798.)  He reported his disability hearing was "the most frightening thing he ever had to do."  (Tr. 799.)  He answered questions from the judge, but also confused the judge.  (*Id*.)  He also reported he was interested in bee keeping and had been spending time with his neighbor, and went to a beekeeper convention with his neighbor and out to eat with him.  (*Id*.)  CNP Roesner noted that when Mr. Brito was interested in something he almost became "involved in it so much that he [became] obsessive."  (*Id*.)  Mr. Brito's mental status examination showed him to be well-groomed with logical and organized thought process and appropriate thought content, sustained attention and concentration, normal memory, and fair judgment and insight.  (*Id*.)  He did not report hearing voices.  (*Id*.)  However, he was also restless, depressed, and anxious with a flat affect.  (*Id*.)  He was excitable when talking about something that interested him.  (*Id*.)  Mr. Brito's diagnoses

13

were unchanged and his Vyvanse dose was maintained.  (*Id*.)  CNP Roesner noted that Mr. Brito was very concerned about adding medications until he had his own funds.  (*Id*.)

Mr. Brito returned to LISW Roll for counseling on November 28, 2017.  (Tr. 804.)  He said he was trying to go out as much as he could, but was still struggling with anxiety.  (*Id*.) He was relaxed with a full affect, but anxious.  (Tr. 805.)  He did not report hallucinations.  (*Id*.)  He reported difficulty with attention and concentration.  (*Id*.)  When he returned to LISW Roll the next month, he reported his disability was denied.  (Tr. 809.)  He reported anxiety, increased negative feelings, anhedonia, and amotivation.  (*Id*.)  His presentation was very intense.  (*Id*.) Mr. Brito's mental status examination showed him to be adequately groomed and cooperative, with no evident paranoia, but his speech was pressured, his thought process was perseverative, and his mood was depressed, anxious, frustrated, and irritable.  (Tr. 810.)

When Mr. Brito returned to LISW Roll on January 15, 2018, he said that his mood was pretty good but he had been on edge the prior month.  (Tr. 814.)  He said he had forgotten that it was Christmas until someone reminded him.  (*Id*.)  He had started to work out again and was trying to "fix things with friends."  (*Id*.)  He was interacting with friends through gaming, but noted that he embarrassed himself when he answered a call using his gaming device and the other party could not hear him.  (*Id*.)  He also reported conflict with his mother.  (*Id*.)  He was cooperative but anxious and tense, with clear but mildly pressured speech on examination, and his affect was flat.  (Tr. 815.)  He denied hallucinations at that time.  (*Id*.)  He reported memory problems, noting he forgot it was Christmas.  (*Id*.)  His attention and concentration were sustained and his judgment and insight were fair.  (*Id*.)

Mr. Brito met with Ms. Stanton on February 19, 2018.  (Tr. 819.)  They discussed the ALJ's decision denying his disability claim and he reported he was not ready to commit to

vocational rehabilitation.  (*Id*.)  He felt that difficult experiences in school were impacting his ability to proceed with vocational rehabilitation, and also expressed concern about decreased endurance and increased fatigue.  (*Id*.)  He also saw CNP Roesner for medication management the same day.  (Tr. 822-23.)  He requested an increase in his Vyvanse, which CNP Roesner agreed to.  (Tr. 823.)  He returned to LISW Roll for counseling the next day, reporting that the day before had been hectic because he saw both Ms. Stanton and CNP Roesner.  (Tr. 828.)  He reported making some progress with friends by playing video games.  (*Id*.)  LISW Roll encouraged him to follow up with Ms. Stanton.  (Tr. 829.)

Mr. Brito followed up with Ms. Stanton on March 12, 2018, but reported he was not ready to move forward with vocational rehabilitation.  (Tr. 833.)  He said that he experienced a lot of anxiety when thinking about having to leave his house and generally only left his house for medical appointments.  (*Id*.)  He also reported that a friend had blocked him on his phone because he was not working, which made him sad.  (*Id*.)   He did have a few high school friends that visited to play video games.  (*Id*.)

At his counseling visit on March 19, 2018, LISW Roll continued to document cooperative, anxious, depressed, and tense behavior and mood.  (Tr. 837.)  Mr. Brito reported that he was always on edge at home, noting a recent meltdown with his younger cousin.  (Tr. 836-37.)  Mr. Brito expressed a desire to work and LISW Roll encouraged him to follow up with Ms. Stanton from vocational services. (Tr. 837.)

Mr. Brito returned to Ms. Stanton on April 23, 2018.  (Tr. 842.)  He said that he felt better but was "still fearful of moving forward with vocational rehabilitation."  (*Id*.)  He felt he might be up to trying it in the summer. (*Id*.)  He reported that he had been going to the gym with a friend during that month and he went to a different gym with his mom one day a week.  (*Id*.)

His parents wanted him to move to the upstairs apartment, but he liked to be near his family and felt he would be too alone in the upstairs apartment. (*Id*.)

Mr. Brito returned to LISW Roll on April 30, 2018, reporting that he had been going to the gym weekly with friends. (Tr. 846.) He was using it as "graded exposure" and was still anxious in some environments. (*Id*.) He reported that he was distracted by what women were wearing at the gym. (*Id*.) He planned on seeing his neighbor to pick up new bees. (*Id*.) He was cooperative but anxious and tense. (*Id*.) His mood was described as "not bad today" and he was "practicing graded exposure." (*Id*.) With respect to his attention and concentration, he reported "difficulty with some improvement." (*Id*.)

Mr. Brito returned to Ms. Stanton on May 8, 2018. (Tr. 851.) They spoke about his creative interests and Mr. Brito reported he would like to get back to drawing and writing, and had some ideas for comic book stories. (*Id*.) He also reported that he was continuing to exercise at a gym with a friend, and that he also exercised at home and played video games. (*Id*.)

Mr. Brito returned to CNP Roesner for medication management on May 21, 2018. (Tr. 854.) CNP Roesner noted that he was overly focused on the women at his gym and how they distracted him. (Tr. 855.) He was also interested in trying a different stimulant than Vyvanse because he was getting a lot of headaches. (*Id*.) His mental status examination showed his behavior to be restless and anxious. (*Id*.) His mood was described as "anxious, focused on girls," and he had a flat affect. (*Id*.) He was excitable when talking about something that interested him. (*Id*.) He did not mention hearing voices. (*Id*.) His attention and concentration were sustained. (*Id*.) CNP Roesner prescribed Concerta in place of Vyvanse. (Tr. 856.)

When Mr. Brito saw LISW Roll for counseling on May 22, 2018, he continued to report that he was distracted by how women dressed at the gym. (Tr. 860.) He also reported he was

interacting with more people and trying new things, but that a lot of his interaction was online. (*Id*.)  He was looking forward to working with his beekeeper neighbor and planned to start vocational services that summer.  (*Id*.)  On mental status examination, he was anxious with distractible attention and concentration.  (*Id*.)  His affect was congruent and other mental status examination findings were generally unremarkable.  (*Id*.)  LISW Roll felt that Mr. Brito would benefit from vocational rehabilitation.  (*Id*.)  Mr. Brito saw Ms. Stanton a week later, reporting that he was doing well and enjoyed visiting with and helping his beekeeper neighbor.  (Tr. 865.) He also reported interest in starting vocational rehabilitation that summer.  (*Id*.)

Mr. Brito returned to CNP Roesner on June 4, 2018.  (Tr. 868.)  He was unsure whether the Concerta was working because he had not been taking it very long.  (Tr. 869.)  He reported feeling tired and fatigued all the time.  (*Id*.)  He also reported that he was not looking for a job, but was getting out more with friends to work out.  (*Id*.)  CNP Roesner indicated if he could do that, "he [could] look for a job."  (*Id*.)  He continued to appear restless and have an anxious behavior/mood on mental status examination.  (*Id*.)  His affect was flat.  (*Id*.)  He was excitable when talking about things that interested him.  (*Id*.)  He did not mention voices, and other examination findings were generally unremarkable.  (*Id*.)  During a June 11, 2018 counseling appointment with LISW Roll, Mr. Brito said that he was continuing to interact with his mom, stepdad, cat, and neighbor.  (Tr. 873.)

Mr. Brito met again with Ms. Stanton on June 12, 2018.  (Tr. 878.)  He said he was frustrated because he was turned away when he tried to donate plasma because of his heart rate and blood pressure.  (*Id*.)  He reported that he continued to enjoy helping his beekeeper friend and explained that he felt if he was "interested in something he [could] sustain attention for several hours."  (*Id*.)  He acknowledged his own stubbornness, expressed worry about having

difficulty getting along with people in a work setting, and worried that he would not want to work if he found the work boring. (*Id*.) He met again with Ms. Stanton on June 25, 2018, and they discussed placing a vocational rehabilitation referral at the next visit. (Tr. 881.)

Mr. Brito saw LISW Roll for counseling on June 26, 2018, reporting that he had a hard time interacting with women and girls, but was interacting more with a friend he went to the gym with. (Tr. 884.) His mental status examination findings included anxious behavior, a stressed mood, congruent affect, distractable attention and concentration, and clear speech. (Tr. 885.)

Mr. Brito returned to Ms. Stanton on July 9, 2018. (Tr. 897.) He reported that he was continuing to exercise and play video games. (*Id*.) He expressed frustration and anxiety when dealing with staff at the plasma donation center because he felt he was ignored. (*Id*.) He reported anger over situations like that and was concerned it would be a problem during vocational rehabilitation services. (*Id*.) He appeared preoccupied with issues in the news, and was obsessing to some degree on "badness." (*Id*.) A referral for vocational rehabilitation services was not placed at that visit because of "reported increased anxiety, and obsessive thoughts about the news." (*Id*.) Ms. Stanton noted she would defer to his psychiatry providers for readiness for the referral, noting that Mr. Brito still seemed willing to participate. (*Id*.)

Mr. Brito continued to treat with LISW Roll and CNP Roesner. (Tr. 900-07.) He requested an increase in his Concerta when he saw CNP Roesner on August 6, 2018. (Tr. 905.) He also reported he had been interacting with an eight-year-old brother of one of his friends, who had friended him in his gaming group. (*Id*.) He was frustrated when the eight-year-old did not understand his explanations. (*Id*.) CNP Roesner explained that young children do not understand long explanations, and suggested that he not interact with the child. (*Id*.) A mental status examination documented Mr. Brito's focus on the eight-year-old boy as well as anxious

and restless behavior and mood and flat affect.  (*Id.*)  His attention and concentration were noted to be sustained, with normal memory, logical and organized thought process, appropriate thought content, and fair judgment and insight.  (*Id.*)  Mr. Brito did not mention voices.  (*Id.*)  His diagnoses were unchanged.  (*Id.*)  His Concerta was increased.  (*Id.*)

Mr. Brito met with Ms. Stanton on August 6, 2018.  (Tr. 910.)  Mr. Brito did not want to proceed with the vocational rehabilitation referral at that time because his mother had recently had surgery and required his assistance around the house.  (*Id.*)  He also discussed his fears about participating in vocational rehabilitation.  (*Id.*)  He reported that he was trying to force himself to do more with friends.  (*Id.*)  He was still gaming but not working out as regularly.  (*Id.*)  He generally stayed close to home and only went out if his family took him.  (*Id.*)

Mr. Brito saw LISW Roll for counseling on October 2, 2018, where he reported a lot of anxiety about the prospect of working.  (Tr. 913-15.)  He reported continued panic attacks and migraine headaches.  (Tr. 913.)  He also continued to report stress and anxiety during an October 22, 2018 appointment with LISW Roll.  (Tr. 919.)  He said his attention and concentration was fine, provided it was something he was interested in.  (Tr. 920.)  Otherwise, he said he zoned out at times.  (*Id.*)  He was cooperative but anxious.  (*Id.*)

Mr. Brito returned to CNP Roesner for medication management on November 5, 2018.  (Tr. 925.)  He reported he was able to work out because he did not have to really interact with people.  (Tr. 926.)  He said that his attorney advised him to reapply for Social Security but he was too scared to pick up the phone to make the phone call.  (*Id.*)  His mental status examination noted he was restless and anxious with a flat affect.  (*Id.*)  His thought process was logical, but could be disorganized.  (*Id.*)  His mood was anxious, and he was focused on an emblem he designed for a video game.  (*Id.*)  He did not mention voices.  (*Id.*)  CNP Roesner noted that Mr.

19

Brito appeared to be anxious, and that his social development was younger than his stated years. (*Id*.)  His diagnoses were unchanged but his Concerta was increased.  (Tr. 926-27.)

At counseling in November 2018, Mr. Brito reported that he continued to work out.  (Tr. 931.)  He also reported regret, embarrassment, and shame over an awkward situation when a girl he had liked in middle school caught him staring at her.  (*Id*.)  He reported that he still had not called Social Security because he was too afraid to do so.  (*Id*.)  LISW Roll noted that Mr. Brito remained anxious.  (Tr. 932.)

Mr. Brito continued to work with vocational rehabilitation services and continued to see LISW Roll during December 2018.  (Tr. 936, 940, 945.)  He reported that he continued to go to the gym with his mom, but still struggled with his anxiety.  (Tr. 940.)  His mental status examination findings were generally unremarkable, except that he remained anxious.  (Tr. 941.)

Mr. Brito was scheduled to start a community-based work assessment at Habitat for Humanity – ReStore during the first two weeks of February 2019, with a job coach present at all times.  (Tr. 953, 975.)  He reported being anxious about starting because it was difficult for him to be around people.  (Tr. 953, 957, 970.)

He completed the two-week placement in early February, working as a part-time sales associate with a job coach.  (Tr. 953, 975.)  On February 21, 2019, he reported to Ms. Stanton that it was very stressful for him because it was hard for him to be around people.  (*Id*.)

When Mr. Brito met with LISW Roll on February 22, 2019, he told her the process was "exhausting and anxiety provoking."  (Tr. 979.)  He had migraines and headaches, which he attributed to his anxiety and stress.  (*Id*.)  He did feel proud to tell friends he had a job, but also felt emotionally drained and "literally hid behind chairs."  (*Id*.)  He said the second week was a

20

little easier because he was able to talk to co-workers and a co-worker brought in a dog, which helped.  (*Id*.)   LISW Roll's impression was: "adjustment improving."  (Tr. 980.)

Mr. Brito saw LISW Roll for counseling on March 22, 2019.  (Tr. 985.)  He reported he was "[n]o longer working, parents doesn't think he should be working without pay."  (*Id*.)  He also reported that working was difficult, but expressed pride in having done it.  (*Id*.)  He planned to return to the program in three months.  (*Id*.)  He had been going to the gym more, making plans with friends, and was considering reaching out to estranged family members.  (*Id*.)  He felt anger, irritation, and emptiness about his mother not understanding him.  (*Id*.)  LISW Roll found he appeared "to be addressing issues in a more reflective way."  (Tr. 986.)

Mr. Brito returned to LISW Roll on April 26, 2019, reporting he had recently met with friends for dinner, a movie, and to hang out.  (Tr. 1034.)  He was out of the house for eight hours, and he and his friends planned to get together once every month.  (*Id*.)  He also reported making some calls about art classes.  (*Id*.)  On examination, LISW Roll found Mr. Brito's mood, judgment, and insight to be fair; other examination findings were unremarkable.  (Tr. 1034-35.)

In May 2019, Mr. Brito reported to Ms. Stanton and LISW Roll that his mom and stepdad were getting divorced.  (Tr. 1045, 1051.)  He understood it was their decision but it was a stressor for him because he was close to his stepdad and he felt like a financial burden to his mom because of his inability to work.  (*Id*.)  On May 17, 2019, Mr. Brito attended counseling with LISW Roll.  (Tr. 1051.)  He reported visiting his old job site at Habitat for Humanity.  (*Id*.)  He explained he could not return to work at Habitat for Humanity until he was able to drive because he could not travel on buses due to his agoraphobia.  (*Id*.)  He reported collaborating with others for about seven months on a logo for his video game group, and that the logo was

being sent for final approval.  (*Id*.)  Mental status examination findings were generally normal, with a notation that Mr. Brito was happy to see people at Habitat for Humanity.  (Tr. 1052.)

Mr. Brito forgot about a June appointment with LISW Roll and returned to see her on July 5, 2019.  (Tr. 1606.)  He reported he had a lot going on, explaining his parents were getting divorced and he and his mom had been arguing.  (*Id*.)  He reported passive thoughts of suicide but no plan.  (*Id*.)  He just wanted the problems to end and restart like a game.  (*Id*.)  He reported he was learning how to drive and studying for his temporary driver's license.  (*Id*.)  On mental status examination, he was cooperative but anxious, stressed, and depressed.  (Tr. 1607.)

## 2.    Opinion Evidence

### i.    Treating Sources

*September 20, 2017*

LISW Roll completed a Medical Source Statement - Mental Capacity on September 20, 2017, which requested ratings for Mr. Brito's functional ability in thirty-two areas.  (Tr. 416-18.) No rating was provided in four areas of functioning.  (Tr. 416-17.)  LISW Roll rated Mr. Brito moderately limited in his ability to initiate and sustain conversation.  (Tr. 416.)  In the remaining twenty-seven areas, she rated him markedly limited.  (Tr. 416-17.)  As support for her functional assessment, LISW Roll explained that Mr. Brito had received behavioral therapy with possible diagnoses of ADHD, Asperger's, anxiety disorder, and depression since 2005.  (Tr. 417.)  She reported that he struggled in school and continued to focus on the negative, had chronic anxiety with agoraphobia, with extremely limited improvement, and had poor judgment and very limited ability to function without support.  (*Id*.)  She also reported that "his psychosocial level of functioning [was] very low despite the fact that he [could] present well on a superficial level." (Tr. 418.)  She indicated that he had no relevant work history, was dependent on family, had a

history of acting out with aggression when he was a student, and had not been able to attend the "most basic mental health support groups." (*Id*.)  She opined that "while he [was] making some guarded progress, he would not be able to function effectively in the general work force." (*Id*.)

*August 2, 2019*

LISW Roll and CNP Roesner completed a Medical Source Statement - Mental Capacity on August 2, 2019.  (Tr. 1685-86.)  They rated Mr. Brito as moderately limited in his ability to maintain personal hygiene and attire appropriate to a work setting.  (Tr. 1686.)  In all other areas, they rated Mr. Brito as markedly or extremely limited.  (Tr. 1686-87.)  As support for their functional assessment, an attachment signed by LISW Roll was included, stating:

> In summary, Mr. Brito's combined Pervasive Developmental Disorder, ADHD-combined type, Schizoaffective Disorder, depressed; and Agoraphobia with panic disorder are reflected in his challenges with Executive functioning, higher level problem solving and his inability to function independently.
>
> Mr. Brito does not possess skills for independent living or functioning in the workplace. Mr. Brito can neither drive or tolerate public transport. He struggles to even make phone calls; he cannot keep his appointments without assistance. He has difficulty following directions and has been observed to be blocked or flooded by anxiety. His social interactions are extremely limited to a select few. He spends most of his time at home. He utilizes online gaming as his primary source of social interaction.
>
> Mr. Brito has never worked in the competitive job market. This provider requested a full Vocational Evaluation completed in 08/2017 and has been advised that a copy has been obtained for your review. After formal Vocational testing and ongoing services to the present time, it has again been concluded Mr. Brito remains unable to function in the competitive job market.
>
> *From Sharon Roesner, CNP, "Mr. Brito receives medications for his ADHD to help him complete tasks, but his impairment and inability to handle executive functioning and his impaired decision making do not allow the medication to work at capacity intended. Mr. Brito's thought processes can be delusional at times, especially when asked to provide an explanation of his conversations."*
>
> Mr. Brito wants to do his best, but based on his developmental and psychiatric limitations, will require long term assistance.  We propose he will be best served

with continued mental health, vocational and supportive services and case
management moving forward.

In my clinical opinion Mr. Brito requires SSI benefits to minimally support himself
and survive in the community.

(Tr. 1687 (emphasis in original).)  The 2017 Individualized Vocational Evaluation Test

Summary was also attached to the Medical Source Statement.  (Tr. 1689-94.)

### ii.    Consultative Evaluation

Mr. Brito presented for a psychological consultative examination with Mitchell Wax,

Ph.D. on December 7, 2015.  (Tr. 281-87.)  He had to be directed to the psychologist's office

after he was found wandering the hall and appearing lost.  (Tr. 283.)  He said the main reason he

could not work was: "I have a hard time interacting with people.  I can't socialize with anybody,

I get anxious and overwhelmed."  (Tr. 282.)  He reported that he lived independently in his

parents' duplex; he lived upstairs, and they lived downstairs.  (*Id*.)  He reported no prior

psychiatric hospitalizations, but that he had received treatment for ADHD, anxiety, and social

phobias.  (*Id*.)  He stopped treatment because his provider left and he had been too anxious to set

up appointments himself; he was waiting for his mother to set appointments for him.  (*Id*.)

Mr. Brito reported that he performed household chores, worked out, and was able to take

care of his personal hygiene.  (Tr. 283.)  He was able to cook for himself but said that he often let

his parents cook for him.  (*Id*.)  He would go downstairs to grab a plate of food and then take it

upstairs to eat.  (*Id*.)  He visited with his parents for about twenty minutes a day and felt closest

to his stepdad.  (*Id*.)  His parents took him grocery shopping about once a month and encouraged

him to buy his own food, but he often stayed in the car because it was too difficult for him to go

into the store.  (*Id*.)  His mother took him to the pet store once a week to buy pet food.  (*Id*.)  He

24

reported having four friends with whom he had contact once or twice per month.  (*Id.*)  One friend also visited with him for about an hour each month to play video games.  (*Id.*)

Dr. Wax observed that Mr. Brito was anxious throughout the evaluation and appeared to be having panic attacks, but was able to answer questions.  (Tr. 283.)  Mr. Brito also appeared tense, agitated, sad.  (Tr. 283-84.)  He made little eye contact, and said he was shy and that it was hard for him to be around other people and out in public.  (Tr. 283.)  Dr. Wax observed that his "speech surprisingly was logical, coherent, and goal directed."  (*Id.*)  Although Mr. Brito reported no problems with irritability or anger, he appeared angry at his parents during the evaluation, especially with his mother for forcing him to go to the store and not making an appointment for him to see a psychiatrist.  (Tr. 284.)  Although he reported he had problems with pacing, Dr. Wax noted that he did not observe trembling, fidgeting, or pacing.  (*Id.*)  Dr. Wax stated that "[s]urprisingly [Mr. Brito] said he had no trouble with panic attacks or agoraphobia, though he appeared to be having panic attacks during the evaluation," explaining that his "eyes would focus and unfocus, his breathing was shallow, and he could make no eye contact during the evaluation."  (*Id.*)  Dr. Wax observed that he had trouble concentrating when he was anxious.  (*Id.*)  Dr. Wax also observed that Mr. Brito often asked for clarification of questions when he was anxious, and even after questions were explained he would say: "Now what is it that I'm supposed to do."  (*Id.*)  Dr. Wax also observed that Mr. Brito "frequently muttered to himself and tapped his face to help him focus."  (*Id.*)  Mr. Brito timed out of tests more than once because he struggled to concentrate.  (Tr. 285.)

Dr. Wax found that Mr. Brito appeared to be functioning in the low average to average range of intelligence.  (Tr. 284.)  His full-scale IQ score of 89 was in the low average range.  (*Id.*)  Dr. Wax explained that there was a significant difference between Mr. Brito's composite

scores and subtest scores, which Dr. Wax felt was indicative of a learning disorder.  (*Id*.)  Mr. Brito was oriented to person, place, time, and situation but showed evidence of mental confusion when he was "self-overwhelmed."  (*Id*.)  Dr. Wax observed that Mr. Brito was generally able to focus and attend to answer questions, and his ability to concentrate was good when he was relaxed.  (*Id*.)  His flow of conversation and thought was good, but he was anxious and silent when notes were being taken and during WAIS-IV testing.  (*Id*.)  He also appeared anxious when he was asked to add or subtract.  (*Id.*)  He subtracted 7s from 100, but did so slowly on his fingers.  (*Id*.)  With respect to insight and judgment, Dr. Wax stated that Mr. Brito "surprisingly did not believe he [had] emotional or mental problems," after telling Dr. Wax that he had anxiety issues and could not leave his house.  (*Id*.)  Mr. Brito reported no issues with memory and Dr. Wax did not observe major memory problems.  (*Id*.)

Dr. Wax diagnosed Mr. Brito with personality disorder with dependent features, panic disorder with agoraphobia, and attention deficit disorder.  (Tr. 285.)  He stated that Mr. Brito was dependent upon his parents to take care of him even though he lived independently in a free apartment above his parents.  (*Id*.)  He opined that Mr. Brito could manage his own funds.  (*Id*.)

Dr. Wax provided a "Functional Assessment" regarding Mr. Brito's mental abilities.  (Tr. 285-86.)  With respect to the first functional category, he opined that Mr. Brito would be able to understand, remember, and carry out instructions to work at a job.  (Tr. 285.)  He noted that Mr. Brito was able to perform household chores, exercise, and play video games.  (*Id*.)  He added that Mr. Brito "had difficulty understanding, remembering, and carrying out instructions when anxious during the evaluation" but he could "understand, remember, and carry out instructions with no difficulty [when relaxed]."  (*Id*.)

As to the second functional category, Dr. Wax opined that Mr. Brito "would have difficulty maintaining attention and concentration on a job due to his attention deficit disorder and anxiety, as when anxious he ha[d] trouble focusing." (Tr. 286.) He noted that Mr. Brito was persistent at home and performed household chores, cooked full meals for himself, exercised, and played video games. (*Id*.)

With respect to the third functional category, Dr. Wax opined that Mr. Brito "would have difficulty responding appropriately to supervisors and coworkers in a work setting due to his dependent personality disorder, panic disorder, and attention deficit disorder." (Tr. 286.) He noted that Mr. Brito was "isolated, and said that he [was] anxious and [felt] overwhelmed when he [was] out of the house." (*Id*.) He also noted that Mr. Brito only had contact with one friend, who he saw for a short period of time once a month to play video games. (*Id*.)

As to the final functional category, Dr. Wax opined that Mr. Brito "would not respond appropriately to work pressures in a work setting," noting that he said he often felt overwhelmed and did not like being out of his house, and that he felt anxious when out and around people. (Tr. 286.)

### iii.    State Agency Psychological Consultants

State agency psychological consultant Joseph Edwards, Ph.D. opined on December 17, 2015 that Mr. Brito had mild restrictions in activities of daily living, moderate difficulties in maintaining concentration, persistence and pace, marked difficulties in maintaining social functioning, and no repeated episodes of decompensation of extended duration. (Tr. 81.) Dr. Edwards also opined that Mr. Brito had the mental RFC to:

- understand 1-3 step instructions;

- carry out 1-3 step tasks in settings without strict time or production demands;

- maintain brief conventional relations with others and minimal public contact; and

- work in a static setting where major changes are explained in advance and implemented gradually to allow for adjustment.

(Tr. 82-84.)

State agency psychological consultant Janet Souder, Psy.D, opined upon reconsideration on May 13, 2016 that Mr. Brito had moderate restrictions in activities of daily living and in maintaining concentration, persistence and pace, marked difficulties in maintaining social functioning, and no repeated episodes of decompensation of extended duration.  (Tr. 93.)  Dr. Souder also opined that Mr. Brito had the mental RFC to:

- understand 1-3 step instructions;

- carry out 1-3 step tasks in settings without strict time or production demands and he could work in a well-spaced or individual setting but should not be expected to work closely or collaboratively with others;

- maintain brief conventional relations with a small group of familiar coworkers/supervisors and minimal public contact, noting that the evidence showed that his ability to independently interact and communicate improved over time but he might initially present as anxious and avoidant;

- work in a static setting where major changes are explained in advance and implemented gradually to allow for adjustment with no frequent changes in work locations or travel.

(Tr. 95-97.)

**C.  Hearing Testimony**

**1.  Plaintiff's Testimony**

Mr. Brito testified at the October 25, 2017 and August 26, 2019 hearings.  (Tr. 39-61, 510-533.)  In 2017, he said that he was unable to work because it was hard for him to be outside his home without feeling a lot of anxiety, that he could not "stop [his] mind from thinking and thinking and thinking," that it was hard for him to talk to people, and that he had a hard time

28

comprehending things. (Tr. 41-42.)  He reported being more at ease with people that knew him because they knew what was "going on with [him]" and understood some of the things he did. (Tr. 42, 43.)  He testified that he tried to apply for jobs back in 2014.  (Tr. 49-50.)  At that time, he thought he might be able to handle a job at a game or pet store, but no longer thought he would be able to because he would not know how to interact and "just going to those places got [his] nerves on edge."  (Tr. 50.)

At one point during the first hearing, Mr. Brito had a difficult time answering the ALJ's question and he stated "It's more the -- I -- I'm sorry.  My head's spinning right now.  Can I go back to that later?  I'm just -- I don't know what I just said."  (Tr. 42.)  The ALJ did not immediately continue with his questioning.  (Tr. 43.)  He turned the questioning over to Mr. Brito's attorney (Tr. 43) and then resumed questioning later in the hearing (Tr. 51-59).  Mr. Brito later said he was not good at explaining things.  (Tr. 58.)  He also testified that he heard voices when he was under stress or anxiety, or when he was agitated, angry, or upset.  (Tr. 60-61.)  He sometimes heard whispering and sometimes heard the voices clearly.  (Tr. 61.)  He said he had heard voices since he was young and it bothered him a lot.  (*Id.*)

Mr. Brito reported attending counseling sessions with Margaret Roll at Metro, and that Sharon Roesner prescribed his mental health medication.  (Tr. 44, 50-51, 530-31.)  He said his medical providers continued to encourage him to work with vocational rehabilitation services and try volunteer work again.  (Tr. 524.)  When asked why they wanted him to do that, he responded: "They figure if I keep doing it I'll be used to it."  (*Id.*)  When asked whether there was anything he did to help manage his mental health, other than the treatment from his medical providers, Brito testified that playing video games helped keep his mind at ease and helped him focus.  (Tr. 52, 59.)  He said it helped relieve his anxiety and stress "at least temporarily," but

reported in 2017 that he had not played video games as much because he had a hard time

playing.  (Tr. 52, 53-54, 59.)  However, he testified in 2019 that he was playing video games an

average of seven to eight hours each day.  (Tr. 520.)  He reported problems sleeping because his

mind raced.  (Tr. 44-45.)  In October 2017, he said friends did not regularly come to his house,

noting that the last time a friend visited was in August and the last time he went to a friend's

house was in January.  (Tr. 45-46.)  He was trying to interact with friends more often, but had

not had much success.  (*Id*.)  In 2019, he testified that he had never been on a date.  (Tr. 511-12.)

In 2017, Mr. Brito said he left his house about twice a month to attend appointments.

(Tr. 46.)  Other people, usually his mom or stepdad, would get his groceries or personal items for

him, and he was not responsible for paying his own bills.  (*Id*.)  In 2019, he testified he was

studying to get his driver's license.  (Tr. 514-15, 531.)  He reported that he could not take the bus

because it caused him to panic.  (Tr. 527.)  He tried to take the bus once, but could not handle it

and had to press the button to stop the bus and get off.  (*Id*.)  In 2017, he reported that he

performed chores at home, including laundry, dishes, taking out the trash, shoveling snow, and

took care of his pets (five turtles, one tarantula, and one scorpion) but he stated it took him a

while to finish his chores.  (Tr. 46-47, 53, 55.)  In 2019, he also reported performing chores at

home.  (Tr. 522-23.)  In 2017, he reported working out at home and said he stopped going to the

gym back in 2015 because being around other people was too hard for him and made him too

anxious.  (Tr. 47-48, 51-52.)  In 2019, he said he was working out at a gym.  (Tr. 511-13.)  He

usually went with his mom, but had gone with a friend too.  (Tr. 511.)  He reported going to the

gym at least two or three times each week.  (Tr. 511-12.)

In 2017, Mr. Brito testified that his anxiety could turn into a panic attack.  (Tr. 48.)

When that happened, he felt the need to go home or get away from whatever situation in was in.

(*Id*.)  Mr. Brito initially lived in the downstairs unit of the duplex with his parents and his aunt lived upstairs.  (Tr. 48-49.)  When he lived with his parents, he stuck to his room like glue, including eating his food in his room.  (Tr. 49.)  In both hearings, he reported playing video games or watching his pets.  (Tr. 49, 52-53, 520.)  In 2017, he reported going to the movies with his mother.  (Tr. 54.)  He said he got headaches from stress and anxiety when he was out of the house for long periods.  (*Id*.)  In 2019, he said leaving the house by himself was scary and terrifying, but he felt like he had a shield by his side if his mom was with him.  (Tr. 528, 532.)

Mr. Brito testified that he visited his dad in jail in May 2017.  (Tr. 55, 519.)  He recalled it was an hour or two drive and he went with one of his dad's relatives.  (*Id*.)  It was really difficult for him to go, but it "was something [he] had to do, regardless of how [he] felt, so [he] had to force himself to do it."  (*Id*.)  He "was ready to freak out" when going through the screening process at the jail, "[b]ut after seeing [his] dad [he] was able to calm [himself] down."  (Tr. 519.)  He said: "I hadn't seen him in years so when I saw him I just, I felt better."  (*Id*.)

At both hearings, Mr. Brito reported being forgetful at times.  (Tr. 56, 518, 532-33.)  He sometimes had a hard time remembering whether he took his medication or whether he brushed his teeth.  (*Id*.)  He also reported having a hard time reading novels, so he usually read comic books online.  (Tr. 56-57, 520-21.)

In 2019, Mr. Brito reported that his mom took him back to Habitat for Humanity to visit with his job coach because he wanted to say thank you.  (Tr. 515.)  The ALJ asked Mr. Brito to talk about the logo that he helped develop with other people.  (*Id*.)  Mr. Brito explained that he and one other person created a "clan emblem," a symbol that they used on their characters in the video game.  (Tr. 515-17.)  The person he worked with lived out of state and they communicated online.  (Tr. 517.)  He said there were twenty-four people in the "clan," but he typically played

31

with three or four other people.  (Tr. 516.)  He also had some friends that he had known since middle school who he played video games with in person once every three or four months.  (Tr. 517-18.)  He reported spending time with his mom and sometimes texting with his stepdad since he and his mom divorced.  (Tr. 518-19.)  He was trying to motivate himself to get back into drawing by watching videos.  (Tr. 521-22.)

The ALJ asked Mr. Brito to explain why he could play online video games with others for seven or eight hours each day but not interact with coworkers at a job on a limited basis, such as about one-third of the workday.  (Tr. 524-25.)  Mr. Brito said it was different because he did not see the people he was interacting with online.  (Tr. 525.)  He also explained that it was very hard for him when he tried working at Habitat for Humanity, and that he even hid in the bathroom for ten minutes one time to avoid others at work.  (*Id*.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the August 26, 2019 hearing.  (Tr. 533-40.)  For his first hypothetical, the ALJ asked the VE to assume an individual of Mr. Brito's age and education who was limited to:

> performing simple, routine, and repetitive tasks but not at a production rate pace, i.e., assembly line work.  Limited to simple work-related decisions and using his judgment in dealing with changes in the work setting.  Able to occasionally interact with supervisors and coworkers.  Never interact with the public.

(Tr. 534.)  The VE testified that there were jobs available that the hypothetical individual could perform, including janitor, dishwasher, and cleaner.  (Tr. 534-35.)

For his second hypothetical, the ALJ asked the VE to assume the same limitations as the first hypothetical, with an additional limitation of superficial interaction.  (Tr. 535.)  The VE testified that his response to the first hypothetical would not change.  (*Id*.)

For his third hypothetical, the ALJ asked the VE to consider the first or second hypotheticals with the additional limitations of: medium exertional level work; frequent climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, or crawling; no exposure to unprotected heights, moving mechanical parts, or operation of a motor vehicle.  (Tr. 535.)  The VE testified that those additional limitations would eliminate the janitor job but the other two jobs would remain available and the job of grounds keeper would be available.  (Tr. 535-36.)

For his fourth hypothetical, the ALJ asked the VE to consider the first three hypotheticals with the additional limitation of no interaction with coworkers.  (Tr. 536.)  The VE testified that the person would be working in isolation and there would be no jobs for him.  (*Id*.)

For his fifth hypothetical, the ALJ asked the VE to consider the first three hypotheticals with the additional limitation of being off task 20% of the time and/or absent from work two days per month.  (Tr. 536.)  The VE testified that there would be no jobs available.  (Tr. 536-37.)

In response to questioning from Mr. Brito's counsel, the VE testified that there would be no jobs available if the individual in the first three hypotheticals required frequent redirection to perform assigned duties.  (Tr. 537.)  He testified that there would be jobs available for those individuals if they were limited to occasional fine manipulation.  (Tr. 538-39.)  He also testified that the jobs of furniture cleaner, cabin cleaner, and tube cleaner would be available if the individual could perform no fine manipulation.  (Tr. 539-40.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and

vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his September 10, 2019 decision, the ALJ made the following findings:[1]

1.    The claimant has not engaged in substantial gainful activity since September 30, 2015, the application date.  (Tr. 462.)

2.    The claimant has the following severe impairments: pervasive developmental disorder; attention deficit hyperactivity disorder ("ADHD"); schizoaffective disorder; agoraphobia with panic disorder; anxiety; personality disorder; and obstructive sleep apnea ("OSA").  (*Id.*)

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 463-71.)

4.    The claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c) except the claimant can frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work related decisions in using his judgment and dealing with changes in the work setting; and able to occasionally interact with supervisors and coworkers on a superficial basis and never interact with the public.  (Tr. 471-89.)

5.    The claimant has no past relevant work.  (Tr. 489.)

6.    The claimant was born in 1994 and was 21 years old, defined as a young individual age 18-49, on the date the application was filed.  (*Id.*)

7.    The claimant has a at least a high school education and can communicate in English.  (*Id.*)

8.    Transferability of job skills is not an issue because claimant has no past relevant work.  (Tr. 490.)

---

[1] The ALJ's findings are summarized.

9.    Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (*Id.*)

Based on the foregoing, the ALJ found Mr. Brito had not been under a disability as defined in the Social Security Act since September 30, 2015, the date the application was filed. (Tr. 491.)

## V.    Plaintiff's Arguments

In his first assignment of error, Mr. Brito asserts the ALJ cherry-picked evidence in analyzing the opinions of Dr. Wax, CNP Roesner, and LISW Roll, minimizing evidence that supported disability and overemphasizing non-disabling facts.  (ECF Doc. 13, pp. 1, 14-22.)  In his second assignment of error, he argues the ALJ erred in giving great weight to the opinions of the state agency psychological consultants, non-treating and non-examining physicians whose opinions were rendered more than four years before the ALJ decision.  (*Id.* at pp. 1, 22-24.) Effectively, Mr. Brito argues the ALJ's decision is not supported by substantial evidence because he erred in his evaluation of the opinion evidence, resulting in an erroneous mental RFC.

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Assignments of Error: Whether ALJ Erred in Evaluating Opinion Evidence**

Mr. Brito asserts that the ALJ did not properly evaluate the medical opinions of consultative examiner Dr. Wax, treating mental health providers CNP Roesner and LISW Roll, and the state agency psychological consultants.  (ECF Doc. 13, pp. 1, 14-15.)  More particularly, he argues the ALJ over emphasized non-disabling facts and minimized evidence supporting the opinions of the examining and treating sources, and further erred by assigning significant weight to outdated opinions by the non-examining state agency psychological consultants.  (*Id.*)  He asserts these errors caused "an erroneous residual functional capacity assessment and rejection of vocational expert testimony that establishes disability."  (*Id.* at p. 14.)  The Commissioner responds that the ALJ properly considered the medical opinion evidence and provided legally sufficient reasons for the weight assigned to each of the opinions.  (ECF Doc. 15, pp. 17-24.)

**1.      Governing Legal Standards**

Because Mr. Brito filed his claim before May 27, 2017, the rules for evaluation of opinion evidence at that time are applicable.  The regulations establish a hierarchy for evaluating medical opinions in which the well-supported opinion of a treating physician is entitled to controlling weight, *see* 20 C.F.R. § 416.927(c)(2), and the opinion of an examining but non-treating medical source is given more weight than a non-examining medical source, *see* 20 C.F.R. § 416.927(c)(1).  "In evaluating the opinion of an examining but nontreating physician, 'the ALJ should consider factors including the length and nature of the treatment relationship, the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty.'"  *Beery v. Comm'r of Soc. Sec.*, 819 F. App'x 405, 408 (6th Cir. 2020) (quoting *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d))).

In cases where there is no treating source opinion, an ALJ must "evaluate all medical opinions" using the factors set forth in 20 C.F.R. § 416.927(c), including: length of treatment history; consistency of the opinion with other evidence; supportability; and specialty or expertise in the medical field related to the individual's impairments. *Walton v. Comm'r of Soc. Sec.*, No. 97–2030, 1999 WL 506979, at *2 (6th Cir. June 7, 1999). Medical opinions are "statements from acceptable medical sources," 20 C.F.R. § 416.927(a)(1), which include licensed physicians (medical or osteopathic doctor) and licensed psychologists, 20 C.F.R. 416.902(a). Under the applicable regulations, neither a licensed social worker nor a licensed nurse practitioner is an acceptable medical source. *See* 20 C.F.R. § 416.902.

Nevertheless, the Social Security Administration has emphasized that opinions from "medical sources, who are not technically deemed 'acceptable medical sources' . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 71 Fed. Reg. 45593, 45595 (August 9, 2006) (rescinded for claims filed on or after March 27, 2017, *see* 82 Fed. Reg. 15263 (March 27, 2017).) Indeed, "an opinion from a medical source who is not an acceptable medical source . . . may outweigh the medical opinion of an acceptable medical source." 20 C.F.R. § 416.927(f). The same factors used in evaluating opinions by acceptable medical sources remain relevant to such opinions, as the factors in 20 C.F.R § 416.927 "represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources.'" SSR 06-03p, 71 Fed. Reg. at 45595.

## 2.    Stated Grounds for Weight Assigned to Mental Health Opinions

Mr. Brito first challenges the weight given to the opinion of Dr. Wax, an examining but non-treating medical source who performed a consultative examination on December 7, 2015.

(ECF Doc. 13, pp. 14-18.)  The ALJ gave partial weight to this opinion, finding Dr. Wax's opinions regarding Mr. Brito's ability to handle finances and difficulty in attention, concentration, and interactions with others to be supported by the evidence, but to be vague and non-specific as to the degree of limitation in those areas of functioning.  (Tr. 481.)  However, he made the following additional finding:

> The undersigned gives <u>less weight</u> to the portion of the opinion noting that the claimant would not be able to respond appropriately to work pressures, because it is vague and <u>not entirely consistent with the evidence of record, including the claimant's reported functioning, examination findings, and the other weighted portions of the opinions of record</u>.

(*Id.* (emphasis added).)  The ALJ followed this finding with a detailed recitation of reported activities and mental status examination findings from the records.  (Tr. 481-83.)  Because the finding given "less weight" was the opinion that Mr. Brito "would not respond appropriately to work pressures in a work setting" (Tr. 286), the Court will focus on that finding herein.

Mr. Brito similarly challenges the weight given to the opinions of treating psychiatric CNP Roesner and treating therapist LISW Roll, who treated Mr. Brito from 2016 through the decision date in 2019.  (ECF Doc. 13, pp. 18-22.)  The ALJ gave little weight to both opinions, noting that neither provider is an acceptable medical source and finding:

> The undersigned gives <u>little weight</u> to Ms. Roesner and Ms. Roll's opinions because they are <u>not entirely consistent with the evidence of record, including the claimant's reported functioning, the examination findings of record, and the other weighted portions of the opinions of record</u>.  The claimant's reported functioning does not evince disabling mental functional limitations.

(Tr. 483-86 (emphasis added).)  The ALJ followed this finding with another detailed recitation of many of the same reported activities and mental status examination findings.  (Tr. 484-88.)  The ALJ highlighted contrasting findings by the state agency psychological consultants that Mr. Brito had marked limitations in social interaction but no more than moderate limitations in the other area of functioning.  (Tr. 485-86, 488.)

Mr. Brito finally challenges the weight given to the opinions of the state agency psychological consultants, two non-treating non-examining physicians who offered opinions based on their review of the medical records as of December 17, 2015 and May 13, 2016.  (ECF Doc. 13, pp. 22-24.)  The ALJ gave significant weight to these opinions, explaining as follows:

> The undersigned finds the State agency psychologists did not examine the claimant, did not have all the medical records available at the hearing, and did not have access to the claimant's hearing testimony. However, they are experts familiar with agency standards, their opinions are informed by program knowledge, and their opinions are also consistent with the claimant's reported functioning, his examination findings, and the other weighted portions of the medical opinions of record. While giving these opinions significant weight, the undersigned articulated the claimant's mental functional limitations in more vocationally relevant terms in the above residual functional capacity assessment, however, with significant influence from these opinions. Therefore, the undersigned gives their opinions significant weight.

(Tr. 481 (emphasis added) (citations omitted).)  In support of this finding, the ALJ again provided a similar recitation of reported activities and mental status examination findings.

### 3.    Legal Analysis

The ALJ explained the weight given to each opinion based on its consistency with three categories of information: (1) Mr. Brito's reported functioning; (2) his examination findings; and (3) "the other weighted portions of the opinions of record."  However, there is a logical flaw in the third finding, that the opinions of the examining sources are given less weight because they are inconsistent with "weighted portions" of the opinions of record.  (Tr. 481, 484, 486.)  This reasoning is circular.  Since the ALJ gave "significant weight" to the state agency opinions, any consistent examining opinions would also be given more weight.  But since the ALJ gave "less weight" to – for example – the consultative examiner's opinion that Mr. Brito "would not respond appropriately to work pressures in a work setting" (Tr. 481), any consistent examining opinions would not be given more weight.  Thus, even if all examining opinions are consistent with one another, they will each be discounted as inconsistent with the "weighted portions of the

opinions of record" so long none of them are given more weight.  A review of the four opinions by examining medical providers suggests that is precisely what occurred in this case.

Dr. Wax conducted a single in-person examination of Mr. Brito on December 7, 2015, after which he opined that Mr. Brito "would not respond appropriately to work pressures in a work setting."  (Tr. 286.)  He based this finding in part on Mr. Brito's reports that he felt overwhelmed often, did not like being out of his house, and was anxious when out and around people.  (*Id.*)  The opinion was supported by Dr. Wax's objective observations, including Mr. Brito's anxious appearance, observed panic attacks, limited eye contact, difficulty coming to the evaluation on his own, difficulty concentrating when anxious, muttering to himself, tapping his face to help with focus, and timing out of tests due to struggling to concentrate.  (Tr. 283-85.)  Even though Mr. Brito "live[d] independently in his free apartment above his parents" and was "able to cook, clean, and grocery shop for himself," Dr. Wax also observed that he was "dependent on his parents to take care of him."  (Tr. 284-85.)

In her September 2017 opinion, LISW Roll similarly opined that Mr. Brito had "poor judgment and extremely limited ability to function w/o support," that "[h]is psychosocial level of functioning [wa]s very low despite the fact that he c[ould] present well on a superficial level," that he had not been able to attend the "most basic mental health support groups," and that "while he [wa]s making some guarded progress, he would not be able to function effectively in the general work force."  (Tr. 417-18.)  She had been treating Mr. Brito for about ten months at that time.  (Tr. 340-43.)  In her therapy sessions, she had counseled Mr. Brito regarding "graded exposure," where he was told to attempt difficult tasks (like making a telephone call or going to the movies with a friend) to make those tasks easier.  (*See, e.g.,* Tr. 371-72, 378, 387-88, 397.)

In her August 2019 opinion, LISW Roll opined that Mr. Brito did "not possess skills for independent living or functioning in the work place," could "neither drive nor tolerate public transport," "struggle[d] to even make phone calls," could not "keep his appointments without assistance," had "difficulty following directions," had "been observed to be blocked or flooded by anxiety," had social interactions that were "extremely limited to a select few," spent "most of his time at home," and used "online gaming as his primary source of social interaction." (Tr. 1687.) She explained: "Mr. Brito wants to do his best, but based on his developmental and psychiatric limitations, will require long term assistance." (*Id.*) She believed he would be "best served with continued mental health, vocational and supportive services and case management going forward." (*Id.*) At the time she rendered this opinion, she had been treating Mr. Brito for nearly three years. (Tr. 340-43.) During that time, she continued to discuss graded exposure with him, and he was challenging himself to go out of the house and to speak with others, with some noted improvement. (*See, e.g.,* Tr. 773, 788, 846, 980, 986, 1034, 1051-52.)

In her August 2019 opinion, CNP Roesner opined that: "Mr. Brito receives medications for his ADHD to help him complete tasks, but his impairment and inability to handle executive functioning and his impaired decision making do not allow the medication to work at capacity intended." (Tr. 1687.) She also noted that his "thought process can be delusional at times, especially when asked to provide an explanation of his conversations." (*Id.*) Her opinion was also based on a three-year treating relationship. (Tr. 347-50.) Her records noted Mr. Brito's anxiety, obsessiveness, distractibility, and social development younger than his stated years. (*See, e.g.,* Tr. 348-49, 361, 383, 799, 855, 860, 869, 905, 926.)

A comparison of these examining medical source opinions reveals that they are all generally consistent in their assessment of the fourth category of Mr. Brito's mental functioning

– the ability to adapt to pressures in a work setting – each offering an opinion suggesting Mr. Brito is not yet equipped to adapt appropriately to the pressures of competitive work.  The providers concluded, respectively, that Mr. Brito was not able to "respond appropriately to work pressures" (Tr. 286), was not able to "function w/o support" or "effectively" in a work setting (Tr. 417), did "not possess skills for independent living or functioning in the work place," and had an "inability to handle executive functioning and . . . impaired decision making" (Tr. 1687). These opinions were supported by objective findings and subjective reports in the consultative examination report and Mr. Brito's treatment records, as detailed in Section II.B., *supra*.

The consistency of these examining opinions in their assessment of Mr. Brito's ability to adapt to work pressures was not explicitly addressed by the ALJ in his decision.  Effectively, by limiting his opinion analysis to the "weighted portions" of other opinions, the ALJ avoided acknowledging or discussing the consistency between the examining opinions.  His circular analysis – which gave examining opinions little weight due to a lack of consistency, then did not acknowledge their consistency with one another precisely because they had been given little or less weight – subverts the comprehensive analysis contemplated by the regulations.

Due to that circular analysis, the "weighted portion" of opinion evidence considered by the ALJ in assessing the fourth category of mental functioning was limited to the state agency psychological consultants' opinions, which were given "significant weight."  The initial state agency consultant based his opinion on Mr. Brito's limited treatment records through July 2015 and the December 2015 consultative examination report.  (Tr. 77-79. 82-84.)  The state agency consultant on reconsideration based her opinion on treatment records through March 2016.  (Tr. 91, 95-97.)  That means neither consultant considered Mr. Brito's considerable mental health treatment records with CNP Roesner and LISW Roll from December 2016 to July 2019, his

44

vocational evaluation in 2017, his subsequent vocational counseling and two-week community work assessment in 2019, or the 2017 and 2019 opinions of CNP Roesner and LISW Roll.

It is not *per se* inappropriate for an ALJ to give more weight to the non-treating non-examining opinions of state agency consultants.  "In appropriate circumstances," the Sixth Circuit has held that "opinions from State agency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96–6p).  However, "[w]here a non-examining source did not review a complete case record, [courts] require some indication that the ALJ at least considered these facts before giving greater weight to that opinion." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (quoting *Blakley*, 581 F.3d at 409 (internal quotations omitted)).  Here, the ALJ did provide a detailed discussion of the subsequent treatment records, but did not explicitly address the inconsistency with the examining opinions of Dr. Wax, CNP Roesner, and LISW Roll as to Mr. Brito's ability to adapt to workplace pressures.

The governing regulations specify that "an opinion from a medical source who is not an acceptable medical source" such as CNP Roesner and LISW Roll "may outweigh the medical opinion of an acceptable medical source."  20 C.F.R. § 416.927(f).  They explain:

> it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole.

20 C.F.R. § 416.927(f)(1).  Here, both CNP Roesner and LISW Roll treated Mr. Brito for his mental health impairments for nearly three years before they wrote their opinions in August 2019.  Their treatment records contained detailed notes regarding both their objective

observations and Mr. Brito's subjective reports, and their opinions provided detailed narrative findings that were supported by the findings in their treatment records.

The ALJ found the opinions of all examining sources regarding Mr. Brito's ability to adapt to workplace pressure to be of "little" or "less" weight because they were not consistent with, *inter alia*, the "weighted portions" of other medical opinions.  By focusing on only the "weighted portions" of the other opinions, the ALJ circumvented recognizing that all examining opinions – including that of the independent consultative examiner – consistently suggested Mr. Brito was not yet equipped to respond appropriately to workplace pressures.  This amounted to a failure to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  Without that bridge, this Court cannot conclude that the ALJ's analysis of the opinion evidence was supported by substantial evidence.

The Court is mindful that the ALJ also cited to two other categories of evidence as supportive of his findings regarding the weight of the opinion evidence, specifically Mr. Brito's reported functioning and his examination findings.  In support of his finding that the opinions of all three examining sources were entitled to "less" or "little" weight, the ALJ highlighted a laundry list of reported activities described by Mr. Brito in his 2015 function report and certain treatment records.  (Tr. 481-82, 484, 486-87.)  The ALJ also recited a lengthy series of mental status examination findings as suggestive of only moderate levels of limitation in three areas of mental functioning, including the ability to adapt to workplace stressors.  (Tr. 482-83, 485, 487-88.)  Mr. Brito notes that the reported functioning relied on by the ALJ consisted of "very limited" activities reported in the 2015 function report, like the ability to play video games or go to the gym with another person.  (ECF Doc. 13, pp. 17-18.)  He also argues that the repetitive

lists of facts were "not commensurate with the analysis required by the agency or this Court to provide a logical bridge between the evidence and the findings." (*Id.* at p. 18.)

The Court is inclined to agree that a technique of repeatedly string-citing large quantities of evidence without targeted discussion or analysis is at odds with the creation of a logical and accurate bridge between the evidence and the result.  It is also observed that the discussion of Mr. Brito's reported activities focused primarily on his 2015 function report and was not always fully reflective of the activities described in the record.  Further, it is also questionable whether the activities reported in the record are truly inconsistent with the examining medical providers' opinions regarding Mr. Brito's limited ability to adapt to work pressures.

Looking specifically at Mr. Brito's ability to adapt and function outside of his home, the ALJ noted that Mr. Brito reported shopping in stores (Tr. 482, 484, 487), but the Court is unaware of evidence suggesting he has ever done so by himself.  Mr. Brito has also gone to the gym with varying degrees of frequency (*id.*), but the Court is unaware of any evidence that he has ever gone to the gym alone.  The same appears to be true for his periodic trips to the movies. Consistent with these reports of activities, Mr. Brito's treatment records reflect that he was purposefully challenging himself to do difficult things when he left his home or spent time with friends.  (*See, e.g.,* Tr. 340-41, 371, 378, 383, 387, 397, 767, 773, 793, 799, 828, 842, 846, 855, 860, 878, 884, 940, 979, 985, 1034, 1051.)

The ALJ also described various supposed inconsistencies raised by Mr. Brito's reported activities, suggesting for instance that Mr. Brito's "community based assessment" as a sales associate with Habitat for Humanity, and subsequent visit to his former coworkers, is inconsistent with his reported functioning.  (Tr. 476-77.)  But it is not clear how reported participation in vocational training with a job coach (Tr. 953, 975) followed by a single return

visit to the worksite with his mother (Tr. 515) suggests an ability to engage in full-time competitive work.  Similarly, while the ALJ indicates Mr. Brito's reported work developing an online logo is "difficult to reconcile with" an inability to leave the house or interact with others (Tr. 477), it is not clear how online communications with an out-of-state person (Tr. 515-17) suggests an ability to engage in competitive work outside the home.  While the ability to perform certain activities may be an appropriate consideration, the ALJ must consider the ability to perform work-like activities on a sustained basis.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) (citing 20 C.F.R. § 404.1520a(c)(2)).

For all of the reasons set forth above, the Court concludes that the ALJ failed to build an accurate and logical bridge between the evidence and the result when he gave significant weight to the dated opinions of the non-treating non-examining state agency consultants without clearly accounting for the contradictory findings of all three examining sources, and when he failed to fully, accurately, and clearly account for the nature and extent of the reported activities he found to be inconsistent with the opinions of the examining sources.  Without a logical bridge, the Court cannot conclude that the ALJ's analysis of the opinion evidence was supported by substantial evidence.  The Court accordingly finds that remand is warranted to allow the ALJ to provide a clear and accurate explanation of the evidence and reasoning that forms the basis for his findings as to the weight given to the opinion evidence.

## VII.   Conclusion

For the foregoing reasons, the Court **VACATES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.  On remand, the ALJ should consider the complete evidentiary record and articulate a clear and accurate explanation for his

findings as to the weight of the opinion evidence, and should specifically account for the findings

of the three examining medical sources with respect to the fourth category of mental functioning.

March 20, 2023                         */s/ Amanda M. Knapp*
                                        AMANDA M. KNAPP
                                        UNITED STATES MAGISTRATE JUDGE